**MISSISSIPPI EAST, INC., Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants,**

**and**

**Aetna Freight Lines, Inc., Daniels Motor Freight, Inc., Detroit-Pittsburgh Motor Freight, Inc., Hess Cartage Company, the Kaplan Trucking Company, Sentle Trucking Corporation, Herriott Trucking Company, Inc., Lattavo Brothers, Inc., and Industrial Cartage Co., Inc., Intervening Defendants.**

**Civ. A. No. 68–1204.**

United States District Court
W. D. Pennsylvania.

July 14, 1969.

Henry M. Wick, Jr., John A. Pillar, Delisi, Wick & Vuono, Pittsburgh, Pa., for plaintiff.

Arthur J. Diskin, Pittsburgh, Pa., John P. McMahon, George, Greek, King, McMahon & McConnaughey, Columbus, Ohio, for intervening defendants.

John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., Richard L. Thornburg, U. S. Atty., Pittsburgh, Pa., for the United States.

Robert W. Ginnane, Gen. Counsel, Barry Roberts, Atty., Interstate Commerce Commission, Washington, D. C., for the Interstate Commerce Commission.

Before STAHL, Circuit Judge, and MARSH and DUMBAULD, District Judges.

## OPINION

STAHL, Circuit Judge.

This action was brought by plaintiff Mississippi East, Inc., to annul and set aside the orders of the Interstate Commerce Commission (ICC) of September 18, 1967 [1] and June 13, 1968,[2] which denied plaintiff's May 17, 1965, application, at Docket No. MC-107726 (Sub-No. 3), for a certificate of public convenience and necessity under § 207(a) of the Interstate Commerce Act, 49 U. S.C. § 307(a).[3]

Mississippi East had been granted temporary authority in the spring of 1965 to transport steel and iron articles from Allenport, Monessen and Washington, Pennsylvania, to points in Illinois, Indiana, Ohio, Michigan and St. Louis, Missouri. The temporary authority was granted prior to a threatened steel strike when consumers around the country were stockpiling large quantities of steel in anticipation of labor difficulties. (105 M.C.C. at 643–644.) Plaintiff subsequently applied for permanent authority to enable it to service the above locations.

---

1. 105 M.C.C. 634.

 With one significant exception not directly relevant here, the ICC substantially adopted the Hearing Examiner's July 1966 report.

2. A further appeal to the Commission, and a request to reopen the proceedings for further hearings, were denied on July 24, 1968, and October 1, 1968.

3. The scope of plaintiff's application was for service "Between Allenport, Monessen and Washington, Pa., on the one hand,

and, on the other, points in Illinois, Indiana, Michigan, Ohio, Wisconsin, and points within the St. Louis, Mo., commercial zone." (Appendix A, 105 M.C.C. at 665; see also ¶ 7 of complaint.) While plaintiff's original application requested approval for service "from and to" these points, the application was amended on June 3, 1965, to request the "between" authority, see 30 Fed.Reg. 7789 (1965), and plaintiff is, of course, bound by this change. It was therefore proper for the ICC to treat the application in its amended form.

Plaintiff's principal attack upon the ICC's denial of its permanent authority application arises from the fact that the hearing examiner, and subsequently the Commission, consolidated and considered in a joint proceeding 32 applications (sponsored by 29 supporting shippers, many of whom supported more than one applicant), with 55 carriers filing protests to the various applications. Because of this situation, plaintiff asserts that "the Commission failed to consider plaintiff's case on its merits, but instead based its decision on evidence in cases other than that in which plaintiff was a party." (Plaintiff's brief, p. 21.)

To accept the position presented by the plaintiff would be to misunderstand the nature of this litigation. These were not 32 separate proceedings, but rather one single consolidated proceeding to which the plaintiff was a party. Plaintiff relies heavily on the following language from United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 527–528, 66 S.Ct. 687, 694, 90 L.Ed. 821 (1946):

> * * * The principal cause of complaint in these respects is that the Commission did not consider each case exclusively on its own record but looked to the evidence in both proceedings in forming its judgment. If this is true and if it has resulted in substantial prejudice to the appellees, as might occur, for example, if the Commission were shown prejudicially to have considered evidence bearing on one case which did not affect it and was presented in the other, and which appellees were given no opportunity to meet, the orders, or one of them, would be improperly grounded.

We believe that the language closely following the above quotation controls this case:

> * * * In the absence of any showing of specific prejudice, the claim comes

down to the highly technical objection that the Commission, in the final stage of forming its judgment, could not in either case take account of what had been done in the other, notwithstanding the closely related character and objects of the applications and the prior proceedings. The contention in its farthest reach amounts to a legal version of the scriptural injunction against letting one's right hand know what one's left hand may be doing.

Obviously it would be consistent neither with good sense nor, we think, with the type of hearing assured by the statute to force the Commission to put on such complete blinders. * * * [G]iven that the report contains all the essential findings required, cf. Florida v. United States, 282 U.S. 194, 51 S.Ct. 119, 75 L.Ed. 291, the Commission is not compelled to annotate to each finding the evidence supporting it. *Id.* at 529, 66 S.Ct. at 695.

■ To require the ICC to conduct separate proceedings in situations similar to the instant case would be to saddle the Commission with an unworkable burden. There is much to be gained in consolidated proceedings. Not only is there benefit to the Commission in having the various applications for service in a single area joined together, but the parties benefit as well, applicants and protestants alike, in that they may interrogate witnesses (including supporting shippers) whose presence at the hearings might otherwise have been difficult or expensive to secure. This serves to accommodate the convenience of all the parties and to make available a great deal of relevant testimony to the hearing examiner and the ICC, thus leading to a more rational decision based upon as much evidence as it is feasible to obtain.

■ Plaintiff asserts that such a consolidated proceeding is unfair [4] because

---

4. Plaintiff did not object to the consolidated proceedings after the ICC announced in its hearing notice that this procedure would be followed. That reg-

ulatory agencies may consolidate related applications is well established. *See* Wales v. United States, 108 F.Supp. 928, 932 (N.D.Tex.1952), aff'd per curiam,

it does not have standing to cross-examine witnesses whose testimony is elicited by other applicants or protestants. To the contrary, we believe plaintiff does have a right to cross-examine [5] and, had plaintiff made such a request and it were denied, the ICC would be precluded from considering evidence concerning applications other than that of the plaintiff. Such a request or denial did not occur here.

In attacking the procedure employed by the Commission to determine the facts upon which its ultimate decision was based, the plaintiff charges the Commission with failure specifically to relate its findings and conclusions to the evidence. We believe that such a point-by-point annotation is not legally required, United States v. Pierce Auto Freight Lines, Inc., *supra,* where the grounds for the Commission's action can be clearly perceived from its order.[6]

The Commission listed and summarized the applications sought (105 M.C.C. at 662–667),[7] presented the tonnage handled by the applicants holding temporary orders (105 M.C.C. at 667–668), summarized the shipper support for the various applications (105 M.C.C. at 648),

---

345 U.S. 954, 73 S.Ct. 941, 97 L.Ed. 1375 (1953); United States v. Pierce Auto Freight Lines, Inc., *supra.*

5. * * * It is to be recalled that all of the appellees, as well as both of the applicants, were parties to both proceedings; were represented at all of the hearings, which were conducted at substantially the same times and places; *and were given full opportunity to present all evidence they considered pertinent, to cross-examine witnesses and otherwise to protect their interests.* Moreover, large portions of the evidence applied as much to one application as to another. This was true, for example, of the proofs relating to traffic conditions, shipper demands, the need for faster service and mechanical refrigeration, and other items. In these circumstances it is difficult to see how appellees could have sustained substantial prejudice from the Commission's consideration of the evidence upon matters as closely related as those in issue in these two proceedings. (Emphasis added.) United States v. Pierce Auto Freight Lines, Inc., 327 U.S. at 528, 66 S.Ct. at 694.

6. In Caravelle Express, Inc., v. United States, 287 F.Supp. 585, 588 (D.Neb. 1968), the court said:
 * * * There is no requirement * * * that the Commission furnish an analysis of each item of evidence that is brought before the Examiner, nor to disclose the mental processes through which the decision was reached. When the Commission's findings are stated with sufficient particularity to clearly inform the Court and the parties of the basis of its decision, they have fulfilled their purpose * * *.
 The ICC has sufficiently met this test here. *See also* Yourga v. United States, 191 F.Supp. 373, 375 (W.D.Pa.1961).

7. The ICC report recognized that the principal reason given by plaintiff and 16 of the other applicants to justify their request for permanent authority was "the proximity of terminal facilities and operating equipment to the source of traffic * * *" 105 M.C.C. at 638.
 In the "Abstract of Pertinent Testimony Submitted by Applicants' Company Witnesses" in the Examiner's report, plaintiff's evidence was summarized as follows:
 Mississippi-East, Inc., MC–107726 (Sub-No. 3).—
 During abnormal peak periods this applicant cannot handle all the steel traffic offered; it had such a period during July and August 1965; this occurs every 3 or 4 years when labor contracts come up for negotiations; the crisis for 1965 ended in early September (TR–373–374).
 This applicant obtained temporary authority on June 8, 1965, to transport iron and steel from Allenport and Monessen, Pa., to points in Ohio, Indiana, Illinois, Michigan, Wisconsin, and St. Louis, Mo. commercial zone (TR–374); it hauled 674 truckloads under this T.A., 90 percent of which originated in Allenport (TR–378); it handled 173 loads in April 1965 as opposed to 55 loads in September from these Pennsylvania origins; the substantial decline is attributed to settlement of the steel strike (TR–379).
 At time of hearing, was handling 20 to 25 truckloads per month under permanent authority into Ohio (TR–380); applicant has no terminal facilities except in the State of Ohio (TR–383–384).
 Present application requests "between authority," but witness admits it will not have any shippers to testify in support of any return eastbound traffic (TR–385).

and described the services being provided by the shippers with permanent authority (105 M.C.C. at 650–658, 668–678). The Commission fully described the conditions under which the temporary authority had been granted to the various applicants:

The considered applications were filed during, or shortly after, the period of negotiations between labor unions and the managements of the principal iron and steel producers in Ohio and western Pennsylvania relating to a new collective bargaining agreement in an attempt to avert a strike. The then effective 3-year agreement was due to expire on April 30, 1965, but the date of the threatened strike was extended because negotiations for a new contract were then in progress. The negotiations extended through the last quarter of 1964 and continued until a satisfactory agreement was reached by the parties in September 1965. During the period of negotiations, and particularly prior to the strike deadline of April 30, 1965, steel producers operated at an alltime peak capacity in response to inventory purchasing by their customers who were fearful that a strike would cut off their sources for iron and steel. Consequently the demand for iron and steel articles caused a heavy demand for motor equipment and transportation from mills to consumers, and the Commission granted temporary authorities to seven applicants herein to meet shippers' admittedly abnormal transportation needs. (105 M.C.C. at 643–644.)

The Commission evaluated the complaints of some of the shippers of inadequacy of service and determined that, but for the abnormal period preceding the anticipated steel strike, there was no specific long-term inadequacy of service:

We are convinced that the applications cannot be granted. The Commission has stated repeatedly that existing carriers normally should be afforded an opportunity to transport all the traffic they can handle in an adequate and efficient manner without added competition of a new operation. One of the basic elements in the determination of public need is the inadequacy of existing service. Dixie Highway Express, Inc. v. United States [D.C.], 242 F.Supp. 1016 (1965), and Watkins Motor Lines, Inc. v. United States [D.C.], 243 F.Supp. 436 (1965). Here the evidence consists primarily of general statements of inability of existing carriers over a period of several years to furnish an adequate supply of equipment to move shipments promptly. Shipper evidence of specific delays or failure to provide equipment was concerned with instances which occurred infrequently, or during the emergency period. Protestants readily admit that equipment availability was a problem during this period. As heretofore pointed out, the Commission granted emergency and the still-pending temporary authorities to approximately nine carriers to meet the movement of this traffic. However carriers' failure to furnish equipment during periods of unusual peak shipper activity such as existed during the emergency does not establish a need for additional service on a permanent basis. Petroleum Transit Co., Inc., Extension-Fertilizer, 88 M.C.C. 398, 401; Willis Shaw Frozen Exp., Inc., Ext.—Five States, 96 M.C.C. 560, 564; and W. J. Digby, Inc., Extension— Seven States, 98 M.C.C. 779, 812. Nor do infrequent or isolated instances of delays in furnishing needed equipment demonstrate a general pattern of protestants' equipment failure or shortages. On the other hand, the evidence amply demonstrates that existing carriers now provide a reasonably adequate supply of equipment and service. An additional deficiency in applicants' evidence is the failure by shippers to establish the specific points or territorial areas where inadequate serv-

ice if any exists. (105 M.C.C. at 659–660).[8]

The Commission declared further:

* * * [T]he record indicates an oversupply of equipment and a decrease in vehicle fleets in order to obtain better usage of existing equipment. Such a situation indicates that the present normal needs of shippers and even the prophesized increasing shipments of the steel industry can be handled by existing carriers. In the circumstances here present, authorized carriers seeking additional traffic are being bypassed and authority is being sought for other carriers to enter certain markets. If this action is taken to assure transportation during nonrecurring emergency situations, and we are not convinced that such emergency situations will become the rule rather than the exception, the act provides other remedies in the form of temporary authorities to meet such situations. If the action being taken is merely directed to establish a larger pool from which a carrier may be selected to accomplish day-to-day movements, we do not believe that a blanket grant of authority would be commensurate with our mandate under the act. Unless we can find a concrete present or future need for service, proliferation of existing business among a larger number of carriers will not promote the economic well-being of the carriers now authorized to perform the service. We are here faced with a large number of authorized carriers seeking, but not obtaining,

business from certain shippers, and at the same time these shippers seeking the availability of additional carriers. We have also considered the increased capacity of those shippers which recently have enlarged their plants and the general evidence, including statistics of an economist and some shippers, which indicate an anticipated average increase of between 2 and 3 percent in the future growth of the steel industry. This evidence, however, does not provide any definiteness with respect to any anticipated growth in shipping between points in the considered territories upon which to base a need for the proposed operations. Some shippers admitted that the growth in the volume of traffic to and from points in eastern Ohio and western Pennsylvania would be affected by the supplying of steel requirements in the Midwest from the recently constructed facilities at Burns Harbor and Portage, Ind. Moreover, there is ample evidence that some protestants have increased their equipment supply to meet increased shipping needs. We think that this evidence provides no basis for a grant of authority for additional operations as proposed. (105 M.C.C. at 660–661.)

The thrust of the Commission's findings was "that [the] applicants * * * have failed to establish that the present or future convenience and necessity require the proposed operations; * * *" (105 M.C.C. at 662.) [9]

From the extensive portions of the ICC order quoted above we are satisfied "that the report contains all the essential find-

8. Among the carriers protesting plaintiff's application were The Kaplan Trucking Company, Sentle Trucking Corp. and Kramer Consolidated Freight Lines, Inc. The scope of the present authority of these carriers is described at 105 M.C.C. 674, 677. Kaplan, Sentle and several other protestants have intervened as defendants in this action.

The identity of all of the protestants who opposed plaintiff's application may be found at pages 3, 4, 5, 9, 10, 11, 12, 13, 14 and 15 of Appendix III to the Examiner's Report.

9. As pointed out in the main brief of the intervening defendants (p. 8), specific findings with reference to plaintiff's application were made in the Examiner's report. The applicant, of course, has the burden of proving the need for the service for which he seeks authority to furnish and he must show that existing facilities are not adequate. Watkins Motor Lines, Inc. v. United States, 243 F.Supp. 436, 439 (D.Neb.1965); Hudson Transit Lines, Inc. v. United States, 82 F.Supp. 153, 157 (S.D.N.Y.1948), aff'd per curiam, 338 U.S. 802, 70 S.Ct. 59, 94 L.Ed. 485 (1949).

ings required * * * [and that as indicated previously] the Commission is not compelled to annotate to each finding the evidence supporting it." United States v. Pierce Auto Freight Lines, Inc., 327 U.S. at 529, 66 S.Ct. at 695.

We have considered the other points raised by plaintiff in the complaint and in the briefs, including plaintiff's claim that the Commission failed to indicate what weight it gave to its temporary authority operations,[10] and find them to be without merit.[11]

On review of the extensive record in this case, we agree with the Commission that,

A full and fair hearing has been held, and the interests of all parties have been adequately represented by counsel at all stages of the proceedings. We find, in the circumstances, that the examiner was fair to all parties. (105 M.C.C. at 642.)

 There is substantial evidence to support this conclusion as well as the substantive result which the Commission reached.[12] Therefore, plaintiff's request to annul and set aside the orders of the Interstate Commerce Commission will be denied.

10. As the Government and the intervenors indicated, the Interstate Commerce Act expressly provides that a grant of temporary authority "shall create no presumption that corresponding permanent authority will be granted thereafter." 49 U.S.C. § 310(a). *See also* Consolidated Freightways Corp. of Delaware v. United States, 289 F.Supp. 126 (N.D.Cal.1968) ; Caravelle Express, Inc. v. United States, *supra*; Colorado-Arizona-California Express, Inc. v. United States, 224 F.Supp. 894, 900 (D.Colo.1963).

A fair reading of the ICC order shows that the Commission did consider the service requirements in the temporary authority period, as well as the applicant's operations during that time, in arriving at its decision.

11. We have also considered the minor factual errors in the Examiner's report relating to plaintiff's application and regard them to be without consequence in determining the essential fairness of the proceeding.

12. In Illinois Central Railroad Co. v. Norfolk & Western Railway Co., 385 U.S. 57, 66, 87 S.Ct. 255, 260, 17 L.Ed.2d 162 (1966), the Supreme Court said:

* * * The test on judicial review is, of course, whether the action of the Commission is supported by "substantial evidence" on the record viewed as a whole, 5 U.S.C. § 1009(e) (5) [now 5 U.S.C. § 706]. Substantial evidence is "enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury."

As this court has stated from time to time, following the pronouncements of the Supreme Court, "the classical criteria limiting the scope of judicial review of Commission orders * * * [are] in substance * * * [the] determination whether there is error of law or lack of substantial evidence, * * *." Pittsburgh & Lake Erie R. R. Co. v. United States, 294 F.Supp. 86, 91 (W.D.Pa. 1968).

*See also* Iowa Beef Packers, Inc. v. United States, 297 F.Supp. 1156 (N.D. Iowa 1969) ; Hughes v. United States, 278 F.Supp. 11, 14 (E.D.Pa.1967) ; Eazor Express, Inc. v. United States, 218 F. Supp. 393, 395 (W.D.Pa.1963).

Furthermore, the "judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body * * *." Southern Kansas Greyhound Lines v. United States, 134 F.Supp. 502, 506 (W.D.Mo.1955), aff'd per curiam, 351 U.S. 921, 76 S.Ct. 779, 100 L.Ed. 1453 (1956). *See also* Short Line, Inc. v. United States, 290 F.Supp. 939, 941 (D. R.I.1968).

Likewise, as stated by Judge Murrah, the denial "of a petition for reconsideration [as requested in the instant proceeding] rests within the sound discretion of the agency and * * * their denial of such a petition will only be reversed for clear abuse of discretion * * *." National Trailer Convoy, Inc. v. United States, 293 F.Supp. 630, 633 (N.D.Okl.1968), aff'd, 394 U.S. 849, 89 S.Ct. 1631, 23 L.Ed.2d 32 (1969).